Exhibit A



NATION

# FBI identifies 2 agents killed in Florida while serving warrant in crimes against children case

**N'dea Yancey-Bragg** and **Kevin Johnson** USA TODAY

Published 9:29 a.m. ET Feb. 2, 2021 | Updated 6:23 p.m. ET Feb. 2, 2021

Two FBI agents were killed and three were wounded in a shooting early Tuesday while agents were serving a warrant in a child exploitation case in Florida, according to the FBI. The suspect died of an apparent self-inflicted gun shot wound, a person familiar with the matter said.

Authorities are investigating whether the suspect had cameras rigged at the apartment to provide an outside view of people who might be approaching at the time of the incident, said the source, who is not authorized to comment publicly.

At 6:04 a.m., FBI and officers from multiple agencies were serving a warrant at the Water Terrace apartment complex in Sunrise, Florida, when the suspect inside started shooting, according to Otishia Browning-Smith, a spokeswoman for the Sunrise Police Department. The suspect, who was not identified, barricaded himself inside the residence.

"A team of law enforcement officers were there to execute a federal court-ordered search warrant in furtherance of a violent crimes against children case," the FBI said.

FBI Director Christopher Wray identified the two deceased agents Tuesday as Daniel Alfin and Laura Schwartzenberger.

The director said two of the three wounded were in stable condition at a Florida hospital. The third agent did not require hospitalization.

"Every day, FBI special agents put themselves in harm's way to keep the American people safe," Wray said. "Special Agent Alfin and Special Agent Schwartzenberger exemplified heroism today in defense of their country. The FBI will always honor their ultimate sacrifice and will be forever grateful for their bravery."

At the White House, President Joe Biden expressed his condolences to the families of the agents.

"I can only imagine how these families are feeling," he told reporters in the Oval Office.

Biden said the families of those "in a combat zone, in the military or an FBI agent or a police officer... dreads the possibility of that call, of receiving that phone call."

"My heart aches for the families," he said. "To put their lives on the line, it's a hell of a price to pay."

The FBI's Inspection Division is investigating the incident per bureau policy, according to a statement from the FBI.

"The review process is thorough and objective and is conducted as expeditiously as possible under the circumstances," the FBI said.

Asked how many rounds were fired, Browning-Smith said, "There were too many to count."

Julius McLymont, whose house borders the apartment complex, told The Associated Press the gunfire erupted with about four shots around 6 a.m.

He thought it was a car backfiring, but about two minutes later, he heard another volley of about five shots. He went outside and looked over his fence as police cars and ambulances rushed in. He saw officers working on someone lying on the ground, who was loaded into an ambulance.

A SWAT team appeared next, officers donning riot gear. They went around the building, yelling, "Go, go, go."

McLymont said he couldn't see the apartment where the shooting happened from his location.

Video from the scene shows several law enforcement agencies swarming the South Florida neighborhood, 11 miles outside Fort Lauderdale.

The Sunrise Police Department announced on Twitter that several roads were closed because of the heavy police presence. Hours later, the department said the scene was safe but urged residents to stay inside during the "ongoing investigation."

Another large group of officers gathered outside a hospital in Fort Lauderdale where victims were taken.

Browning-Smith said four to six Sunrise officers worked as a backup unit during the early morning operation, but none of them was injured. She did not identify the deceased suspect but said the department had no prior dealings with the person, nor was she aware of any concern before the confrontation that the suspect was armed.

In December, an FBI agent was wounded while serving a warrant near Albuquerque, New Mexico. Derick Pacheco-Garcia, 32, was charged with assault on a federal officer and as a felon in possession of a firearm. In 2008, FBI Special Agent Sam Hicks was fatally shot while serving a warrant near Pittsburgh as part of an investigation into a violent drug trafficking group.

Acting Attorney General Monty Wilkinson was briefed on the shooting and closely monitored the situation Tuesday, a Justice Department spokesperson said.

The loss of the two agents Tuesday morning marked the deadliest day for the bureau since 2013 when two agents died during training exercises for the FBI's elite Hostage Rescue Team.

The FBI Agents Association called the deaths "devastating to the entire FBI community and to our country."

"These agents were working to protect the most vulnerable in our society," association President Brian O'Hare said Tuesday. "FBIAA stands with the agents' families and pledges our support to them during this difficult time."

**Latest COVID-19 updates:** Hospitals warned not to reserve vaccine for rich people; most nursing home caregivers declining vaccine

*Contributing: Michael Collins, USA TODAY; The Associated Press*

*Follow N'dea Yancey-Bragg on Twitter: @NdeaYanceyBragg*

Exhibit B

UNCLASSIFIED

# FAX

**TO:**    Gannett Co., Inc.
**ATTN:**   Subpoena Processing
**ADDR:**   7950 Jones Branch Drive
         McLean, VA, 22107

**FAX #:**   --
**TEL #:**   703-854-6000

**DATE:**   April 29th, 2021

**FROM:**   Tracie E Smith
          Special Agent
**ADDR:**   801 International Dr.
          Linthicum Heights, MD, 21090
**FAX #:**   410-981-8712
**TEL #:**   410-981-8702   Desk
          (504) 402-7432 Cell

---

## DETAILS

**Subject:**
Administrative Subpoena Number 690538

**Special Handling Instructions:**
Please email response marked to the attention of Tracie Smith at the following email address: TESMITH2@fbi.gov

*Please email tesmith2@fbi.gov to confirm receipt.*

**Brief Description of Communication Faxed:**

---

**WARNING**

Information attached to the cover sheet is U.S. Government Property. If you are not the intended recipient of this information disclosure, reproduction, distribution, or use of this information is prohibited (18.USC, § 641). Please notify the originator or local FBI Office immediately to arrange for proper disposition.

UNCLASSIFIED

UNCLASSIFIED

U.S. DEPARTMENT OF JUSTICE/FEDERAL BUREAU OF INVESTIGATION

# SUBPOENA

FD-1035 (REV 2019-05-20)

Subpoena number: 690538    When responding please reference this subpoena number.

**In the matter of case number(s):** 305A-HQ-1497320-I033_BP

| TO: | Gannett Co., Inc.<br>Subpoena Processing | **TELEPHONE:** 703-854-6000 |
| --- | --- | --- |
| **ADDRESS:** | 7950 Jones Branch Drive<br>McLean, VA 22107 | **FAX:** -- |

## GREETING:

By the service of this subpoena upon you by **Tracie E Smith**, who is authorized to serve it, you are hereby commanded and required to disclose to **Tracie E Smith**, a representative of the FBI, the following information for the period **2021-02-03** to **2021-02-03** or the billing cycle including the requested time period: which may be relevant to an authorized law enforcement inquiry, involving the following: - Continued on Attachment A.

Please see the attached page explaining some terms that may be used in this demand. All time values are in the US/Eastern time zone, unless otherwise indicated.

**THE INFORMATION SOUGHT THROUGH THIS SUBPOENA RELATES TO A FEDERAL CRIMINAL INVESTIGATION BEING CONDUCTED BY THE FBI.**

**YOUR COMPANY IS REQUIRED TO FURNISH THIS INFORMATION.**

**YOU ARE REQUESTED NOT TO DISCLOSE THE EXISTENCE OF THIS SUBPOENA INDEFINITELY AS ANY SUCH DISCLOSURE COULD INTERFERE WITH AN ONGOING INVESTIGATION AND ENFORCEMENT OF THE LAW.**

Compliance must be made by personal appearance or production of records no later than the 29th day of May, 2021 at 09:00 o'clock AM, at 801 International Dr., Linthicum Heights, MD 21090.

In lieu of a personal appearance, the information can be provided, via facsimile, marked to the attention of **Tracie Smith**, at telephone number: 410-981-8712.

In lieu of a personal appearance, the information can be provided, via mail, marked to the attention of **Tracie Smith**, at the following address: 801 International Dr., Linthicum Heights, MD 21090.

In lieu of a personal appearance, the information can be provided, via email, marked to the attention of **Tracie Smith**, at the following email: TESMITH2@fbi.gov.

If you refuse to obey this subpoena, the United States Attorney General may invoke the aid of a United States District Court to compel compliance. Your failure to obey the resulting court order may be punished as contempt.

Issued under authority of Public Law No. 106-544, §5(a)
(18 U.S.C. §3486)
**ORIGINAL**

Signature: S/ J. Brooke Donahue

Name: J. Brooke Donahue
Title: Supervisory Special Agent
Issued this 29th day of April, 2021

**UNCLASSIFIED**

UNCLASSIFIED

| Case number(s):<br>305A-HQ-1497320-I033_BP | | Subpoena number: 690538 |
|---|---|---|

**CERTIFICATE OF SUBPOENA**
(Pursuant to Public Law No. 544, 106th Cong., 2nd Session)
(18 U.S.C. §3486)

| HOW<br>SUBPOENA<br>WAS<br>SERVED<br><br>(Check One) | ☐ | I handed an attested copy thereof to an officer or agent of the company authorized to receive service of process. |
|---|---|---|
| | ☐ | I provided via facsimile an attested copy thereof to an officer or agent of the company authorized to receive service of process. |
| | ☐ | I mailed an attested copy thereof to an officer or agent of the company authorized to receive service of process. |
| | ☐ | Signature on page one indicates that this subpoena was served electronically on the referenced date. |

| DATE SUBPOENA SERVED(Day, Month, Year) | TIME |
|---|---|
| SIGNATURE | TITLE |

UNCLASSIFIED

APR-29-2021  16:36      VCAC MCCU                                                                                P.004

**UNCLASSIFIED**

| Case number(s):  305A-HQ-1497320-I033_BP | Subpoena number:  690538 |
| --- | --- |

Public Law 544 - 106th Congress
2nd Session, H.R. 3048n, AN ACT

(a) Authorization.—(1)(A) In any investigation of ·

((i)(I) a Federal health care offense; or (II) a Federal offense involving the sexual exploitation or abuse of children, the Attorney General; or

(ii) an offense under section 871 or 879, or a threat against a person protected by the United States Secret Service under paragraph (5) or (6) of section 3056, if the Director of the Secret Service determines that the threat constituting the offense or the threat against the person protected is imminent, the Secretary of the Treasury, may issue in writing and cause to be served a subpoena requiring the production and testimony described in subparagraph (B).

(B) Except as provided in subparagraph (C), a subpoena issued under subparagraph (A) may require—

(i) the production of any records or other things relevant to the investigation; and

(ii) testimony by the custodian of the things required to be produced concerning the production and authenticity of those things.

(C) A subpoena issued under subparagraph (A) with respect to a provider of electronic communication service or remote computing service, in an investigation of a Federal offense involving the sexual exploitation or abuse of children shall not extend beyond—

(i) requiring that provider to disclose the information specified in section 2703(c)(2), which may be relevant to an authorized law enforcement inquiry; or

(ii) requiring a custodian of the records of that provider to give testimony concerning the production and authentication of such records or information.

(D) As used in this paragraph, the term "Federal offense involving the sexual exploitation or abuse of children" means an offense under section 1201, 1591, 2241(c), 2242, 2243, 2251, 2251A, **2252**, 2252A, 2260, 2421, 2422, or 2423, in which the victim is an individual who has not attained the age of 18 years.

(2) A subpoena under this subsection shall describe the objects required to be produced and prescribe a return date within a reasonable period of time within which the objects can be assembled and made available.

(3) The production of records relating to a Federal health care offense shall not be required under this section at any place more than 500 miles distant from the place where the subpoena for the production of such records is served. The production of things in any other case may be required from any place within the United States or subject to the laws or jurisdiction of the United States.

(4) Witnesses subpoenaed under this section shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

(5) At any time before the return date specified in the summons, the person or entity summoned may, in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the summons, or a prohibition of disclosure ordered by a court under paragraph (6).

(6)(A) A United State district court for the district in which the summons is or will be served, upon application of the United States, may issue an ex parte order that no person or entity disclose to any other person or entity (other than to an attorney in order to obtain legal advice) the existence of such summons for a period of up to 90 days.

(B) Such order may be issued on a showing that the things being sought may be relevant to the investigation and there is reason to believe that such disclosure may result in—

(i) endangerment to the life or physical safety of any person;

(ii) flight to avoid prosecution;

(iii) destruction of or tampering with evidence; or

(iv) intimidation of potential witnesses

(C) An order under this paragraph may be renewed for additional periods of up to 90 days upon a showing that the circumstances described in subparagraph (B) continue to exist.

(7) A summons issued under this section shall not require the production of anything that would be protected from production under the standards applicable to a subpoena duces tecum issued by a court of the United States.

(8) If no case or proceeding arises from the production of records or other things pursuant to this section within a reasonable time after those records or things are produced, the agency to which those records or things were delivered shall, upon written demand made by the person producing those records or things, return them to that person, except where the production required was only of copies rather than originals.

(9) A subpoena issued under paragraph (1)(A)(i)(II) or (1)(A)(ii) may require production as soon as possible, but in no event less than 24 hours after service of the subpoena.

(10) As soon as practicable following the issuance of a subpoena under paragraph (1)(A)(ii), the Secretary of the Treasury shall notify the Attorney General of its issuance.

(b) Service.—A subpoena issued under this section may be served by any person who is at least 18 years of age and is designated in the subpoena to serve it. Service upon a natural person may be made by personal delivery of the subpoena to him. Service may be made upon a domestic or foreign corporation or upon a partnership or upon a unincorporated association which is subject to suit under a common name, by delivering the subpoena to an officer, to a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process. The affidavit of the person serving the subpoena entered on a true copy thereof by the person serving it shall be proof of service.

(c) Enforcement.—In the case of contumacy by or refusal to obey a subpoena issued to any person, the Attorney General may invoke the aid of any court of the United States within the jurisdiction of which the investigation is carried on or of which the subpoenaed person is an inhabitant, or in which he carries on business or may be found, to compel compliance with the subpoena. The court may issue an order requiring the subpoenaed person to appear before the Attorney General to produce records, if so ordered, or to give testimony concerning the production and authentication of such records. Any failure to obey the order of the court may be punished by the court as a contempt thereof. All process in any such case may be served in any judicial district in which such person may be found.

(d) Immunity From Civil Liability.—Notwithstanding any Federal, State, or local law, any person, including officers, agents, and employees, receiving a subpoena under this section, who complies in good faith with the subpoena and thus produces the materials sought, shall not be liable in any court of any State or the United States to any customer or other person for such production or for nondisclosure of that production to the customer.

(e) Limitation on Use.—(1) Health information about an individual that is disclosed under this section may not be used in, or disclosed to any person for use in, any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information unless the action or investigation arises out of and is directly related to receipt of health care or payment for health care or action involving a fraudulent claim related to health; or if authorized by an appropriate order of a court of competent jurisdiction, granted after application showing good cause therefor.

(2) In assessing good cause, the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services.

(3) Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

**UNCLASSIFIED**

UNCLASSIFIED

| Case number(s): | ATTACHMENT A | Subpoena number: 690538 |
|---|---|---|
| 305A-HQ-1497320-1033_BP | | |

IP addresses, and associated dates, times, time zones, user agent strings, communication ports, telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"), for computers or other electronic devices that accessed the following URL:
usatoday.com/story/news/nation/2021/02/02/sunrise-florida-shooting-fbiagents-injured/4352344001/ between 2/3/2021 00:03 UTC - 2/3/2021 00:38 UTC.

UNCLASSIFIED

UNCLASSIFIED

| | Subpoena number:  690538 |
|---|---|

| *TERMINOLOGY* |
|---|

**IMPORTANT NOTE** This part is not a demand but an explanation of some terms used in the subpoena and some suggestions to help with compliance. The actual information demanded by this subpoena is set forth on the front of the subpoena or in Attachment A, if so indicated on the first page. The terms explained here may or may not be part of the information demanded.

> If the subpoena makes a demand for "local and long distance connection records, or records of session times and durations" for telephone or cell phone service, that means to include the following records if your company maintains these records—

- Incoming and outgoing local, regional, long distance, international, wholesale, cellular, paging, toll free, and prepaid connection records;
- Credit card calls (including, but not limited to, calls made through major credit card companies); and
- Alternate billed number calls (calls billed to third parties, collect calls, and calling card calls for calls through cards issued by the communications carrier originating from the foregoing telephone number(s) or terminating at the foregoing telephone numbers(s)).

> If the subpoena makes a demand for "length of service," include the start date and the close date if the account closed.

> If the subpoena makes a demand for customer or subscriber address, include both the postal address and physical address, if known.

> If the subpoena makes a demand for "means and source of payment" that means--

- Method of payment to initiate and maintain service; and
- Any available identification numbers for method of payment, including credit card numbers or prepaid calling card numbers.

> **We are not directing that you provide, and you should not provide, information pursuant to this subpoena that would disclose the content of any wire communication.** That means you should not disclose "any information concerning the substance, purport, or meaning of" a communication, as defined in Title 18 United States Code, Section 2510(8). Subject lines of e-mails are content information and should not be provided in response to this subpoena.

> If the records provided are particularly large we request that you provide this information in electronic format preferably on a CD-ROM.

UNCLASSIFIED

# Exhibit C

# Ballard Spahr
### LLP

1909 K Street, NW
12th Floor
Washington, DC 20006-1157
TEL 202.661.2200
FAX 202.661.2299
www.ballardspahr.com

Charles D. Tobin
Tel: 202.661.2218
Fax: 202.661.2299
tobinc@ballardspahr.com

May 22, 2021

*Via Email & FedEx*

Special Agent Tracie E. Smith
Federal Bureau of Investigation
801 International Drive
Linthicum Heights, MD 21090
tesmith2@fbi.gov

Re:     **FBI Subpoena to Gannett Co., Inc.**
        **Case No. 305A-HQ-1497320-I033_BP**
        **Administrative Subpoena No. 690538**

Dear Special Agent Smith:

This firm represents Gannett Satellite Information Network, LLC, publisher of *USA TODAY*, in connection with the administrative subpoena that the FBI faxed on April 29, 2021, in the above-referenced matter. Please refer all further communications in this matter to my attention.[1]

The FBI's subpoena seeks IP addresses and other potentially identifying information "for computers or other electronic devices" that accessed a February 2, 2021 *USA TODAY* news report, *FBI identifies 2 agents killed in Florida while serving warrant in crimes against children case*, from "00:03-00:38 UTC on 2/3/21" – i.e., between 8:03 PM and 8:38 PM on February 2, 2021.[2] As such, the subpoena seeks records of a news organization that fall squarely under the protections of the First Amendment to the U.S. Constitution and the United States Attorney General's regulations for subpoenas to the news media. Therefore, Gannett would object to providing the records you have requested.

The Department of Justice, correctly recognizing that subpoenas can "unreasonably impair newsgathering activities" and that "freedom of the press can be no broader than

---

[1] The subpoena was faxed to an office closed due to the pandemic. It was addressed to Gannett Co., Inc. which is the ultimate parent company of Gannett Satellite.

[2] The URL in question is https://www.usatoday.com/story/news/nation/2021/02/02/sunrise-florida-shooting-fbi-agents-injured/4352344001/.

Special Agent Smith
May 22, 2021
Page 2

freedom of members of the news media to investigate and report the news," in 2014 and again in 2015 revised its long-standing regulation limiting the authority to subpoena journalists or news organizations in federal criminal cases. Codified at 28 C.F.R. § 50.10 *et seq.*, the regulations now "ensure more robust oversight by senior [Justice] Department officials" before allowing subpoenas to be issued to the press – including administrative subpoenas like the one you have issued to Gannett. The regulations are:

- The Attorney General's *Policy Regarding Obtaining Information From, or Records of, Members of the News Media; and Regarding Questioning, Arresting, or Charging Members of the News Media*, as published in the *Federal Register*, available at http://www.gpo.gov/fdsys/pkg/FR-2014-02-27/pdf/2014-04239.pdf; and

- The Attorney General's *Updated Policy Regarding Obtaining Information From, or Records of, Members of the News Media; and Regarding Questioning, Arresting, or Charging Member[s] of the News Media*, available at http://www.justice.gov/file/317831/download.

These regulations provide, among other important protections for the press:

- No process to compel the disclosure of a journalists' information may initiate without the Attorney General himself signing off;

- The records sought under the subpoena must be "essential to a successful investigation or prosecution," and thus the subpoena may not seek "peripheral, nonessential, cumulative or speculative information";

- The Government must "have made all reasonable efforts to obtain the information from alternative, non-media sources";

- Before issuing a subpoena, the Government must "have pursued negotiations with the affected member of the news media" unless the Attorney General determined otherwise for "compelling reasons" involving a "clear and substantial threat to the integrity with the investigation, risk grave harm to national security, or present an imminent risk of death or serious bodily harm"; and

- The proposed subpoena generally should be limited to verification.

Special Agent Smith
May 22, 2021
Page 3

The FBI did not, to our knowledge, follow these straightforward procedures before issuing the subpoena to Gannett. The subpoena therefore is not authorized under federal regulations, and we object to its service.

Moreover, as courts across the country have long and consistently recognized, the First Amendment sharply restricts subpoenas like this one that compel publishers to disclose the identities of their readers. *See, e.g.*, *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461 et seq.*, 706 F. Supp. 2d 11, 18 (D.D.C. 2009) ("Because the subpoena seeks records of customer purchases of expressive materials, which are presumptively protected by the First Amendment, the records are presumptively protected as well."); *In re Grand Jury Subpoena (Amazon.com)*, 246 F.R.D. 570, 572 (W.D. Wis. 2007) ("This presents a legitimate First Amendment concern. The subpoena is troubling because it permits the government to peek into the reading habits of specific individuals without their prior knowledge or permission."); *In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc.*, 26 Med. L. Rptr. 1599, 1600 (D.D.C. Apr. 6, 1998) ("The Court finds that the First Amendment is indeed implicated by the subpoenas to Kramerbooks and Barnes & Noble. The First Amendment right to receive ideas 'follows ineluctably from the sender's . . . right to send them' and is also 'a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom.'") (quoting *Board of Education v. Pico*, 457 U.S. 853, 867 (1982)); *Lubin v. Agora, Inc.*, 882 A.2d 833, 846 (Md. 2005) ("To the extent that the Commissioner's subpoenas require Agora, a publisher, to disclose the identities of those who subscribe to or purchase its materials, the subpoenas seek information within the protective umbrella of the First Amendment."); *Tattered Cover v. City of Thornton*, 44 P.3d 1044, 1053 (Colo. 2002) ("[T]he First Amendment embraces the individual's right to purchase and read whatever books she wishes to, without fear that the government will take steps to discover which books she buys, reads, or intends to read. A governmental search warrant directed to a bookstore that authorizes seizure of records that reflect a customer's purchases necessarily intrudes into areas protected by this right.").

We presume that your office was unaware of either the Attorney General's regulations or the First Amendment limits on demands for reader identification. <u>Now that we have brought this to your attention, please confirm to my office by return email (tobinc@ballardspahr.com), by no later than the close of business on Tuesday, May 25, 2021, that the FBI has withdrawn the subpoena.</u>

Special Agent Smith
May 22, 2021
Page 4

     If you wish to discuss this matter by telephone, please call me at 202-661-2218.

                  Very truly yours,

                  BALLARD SPAHR LLP

                  Charles D. Tobin

cc:    Thomas Curley, Esq., Gannett Co., Inc.

Exhibit D

In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc., No. 98-135 (NHJ) and 98-138 (NHJ), 1998 BL 139, 26 Med. L. Rptr. 1599 (D.D.C. Apr. 06, 1998), Court Opinion

**Pagination**

\*     BL

Majority Opinion >

U.S. District Court, District of Columbia

---

IN RE GRAND JURY SUBPOENA TO KRAMERBOOKS & AFTERWORDS INC.; IN RE GRAND JURY SUBPOENA TO BARNES & NOBLE INC.

---

Misc. Action Nos. 98-135 (NHJ) and 98-138 (NHJ)

April 6, 1998

Motion by non-party bookstores and former White House intern seeking to quash subpoenas issued by office of independent counsel.

Office of independent counsel ordered to submit ex parte filing describing its need for materials sought and connection between information sought and grand jury investigation.

Johnson, J.:

**Full Text of Opinion**

The Independent Counsel has issued a subpoena to Kramerbooks & afterwords, Inc. ("Kramerbooks"), an independent bookstore and cafe in Dupont Circle. The subpoena requests "all documents and things referring or relating to any purchase by Monica Lewinsky" from November 1995 to the present, including but not limited to certain purchases made by check. Both Kramerbooks and Monica Lewinsky have moved to quash the subpoenas. Barnes & Noble, a national chain of bookstores, has received a similar subpoena directed to one of its local stores, and has moved to quash that subpoena. [1] Before the Court are also briefs filed by *amici curiae* in support of the motions to quash: one from the American Civil Liberties Union and the American Civil Liberties Union of the National Capital Area and another from the American Booksellers Foundation for Free Expression *et al.*



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

➕ In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc., No. 98-135 (NHJ) and 98-138 (NHJ), 1998 BL 139, 26
Med. L. Rptr. 1599 (D.D.C. Apr. 06, 1998), Court Opinion

The Office of Independent Counsel ("OIC") contends that the Supreme Court's decision in United States v. R.
Enterprises, 498 U.S. 292 (1991), governs the outcome of the motions to quash. In *R. Enterprises*, a federal
grand jury issued subpoenas to three companies its suspected of interstate transportation of obscene
materials. Id. at 294 . The subpoenas in that case sought corporate books and records as well as copies of
videotapes and the three companies moved to quash the subpoenas, arguing that the materials sought were
irrelevant to the grand jury's investigation and that the enforcement of the subpoenas was likely to infringe
upon their First Amendment rights. Id. at 294-95 .

The *R. Enterprises* Court decided that the movants' relevancy argument was unavailing because there existed
a "reasonable possibility that the category of materials the Government seeks will produce information relevant
to the general subject of the grand jury's investigation. Id. at 301 . The Court went on to state: "The Court of
Appeals determined that the subpoenas did not satisfy Rule 17(c) and thus did not pass on the First
Amendment issue. We express no view on this issue and leave it to be resolved by the Court of Appeals." Id.
at 303 . Because it did not address the First Amendment question at issue here, *R. Enterprises* does not end
the Court's inquiry.

The Court finds that the First Amendment is indeed implicated by the subpoenas to Kramerbooks and Barnes
& Noble. The First Amendment right to receive ideas "follows ineluctably from the sender's ... right to send
them" and is also "a necessary predicate to the recipient's meaningful exercise of his own rights of speech,
press, and political freedom." Board of Education v. Pico, 457 U.S. 853 , 867 (1982); *see also* Kleindienst v.
Mandel, 408 U.S. 753 , 762 (1972) ("In a variety of contexts this Court has referred to a First Amendment 'right
to receive information and **[*2]** ideas.' "); Griswold v. Connecticut 381 U.S. 479 , 482 ("The right of freedom of
speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive,
the right to read...").

It is apparent that the materials sought by the subpoenas would disclose specific titles of books purchased by
Ms. Lewinsky, whose First Amendment rights are at issue here. *See* Virginia v. American Booksellers
Association 484 U.S. 383 , 393 [ 14 Med.L.Rptr. 2145 ] (1988) (recognizing First Amendment rights of
bookbuyers). Kramerbooks and Barnes & Noble are also engaged in constitutionally protected expressive
activities. "The constitutional guarantee of freedom of the press embraces the circulation of books as well as
their publication." Bantam Books, Inc. v. Sullivan, 372 U.S. 58 , 65 n.6 [ 1 Med.L.Rptr. 1116 ] (1963). Justice
Douglas emphasized the First Amendment implications of revealing an individual's book purchases: "A
requirement that a publisher disclose the identity of those who buy his books, pamphlets, or papers is indeed
the beginning of surveillance of the press ... Once the government can demand of a publisher the names of the
purchasers of his publications, the free press as we know it disappears ... the purchase of a book or pamphlet
today may result in a subpoena tomorrow." United States v. Rumely, 345 U.S. 41 , 57 (1953) (Douglas, J.,
concurring); *see also* Denver Area Educational Telecommunications Consortium Inc. v. FCC, 116 S.Ct. 2374 ,
2391 (1996) (finding that the requirement that viewers must affirmatively request certain programming "will
further restrict viewing by subscribers who fear for their reputations should the operator, advertently or
inadvertently, disclose the list of those who wish to watch the 'patently offensive' channel"); Lamont v.
Postmaster General, 381 U.S. 301 , 307 (1965) (finding unconstitutional the requirement that an addressee file
a written request with the post office to receive political propaganda because such a requirement "is almost
certain to have a deterrent effect").



⊞ In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc., No. 98-135 (NHJ) and 98-138 (NHJ), 1998 BL 139, 26
   Med. L. Rptr. 1599 (D.D.C. Apr. 06, 1998), Court Opinion

[1] The bookstores and Ms. Lewinsky have persuasively alleged a chilling effect on their First Amendment
rights. Many customers have informed Kramerbooks personnel that they will no longer shop at the bookstore
because they believed Kramerbooks to have turned documents over to the OIC that reveal a patron's choice of
books. Kramer Decl. at ¶17. Sales at the bookstore have also declined, id. at ¶18, and the store was picketed
by a group of librarians. Kramerbooks' Mot. to Quash at Exh. 2. Barnes & Nobles states that it believes the
compelled disclosure of this information will chill its First Amendment right to distribute reading material and its
customers' First Amendment right to have access to such material. Rosen Decl. at ¶8. Ms. Lewinsky alleges
that her right to purchase books has been chilled for fear of intrusion and embarrassment. Lewinsky's Mot. to
Quash at p. 6.

The Supreme Court has never explicitly defined the standard under which a grand jury subpoena that
implicates the First Amendment must be examined, though it has noted, "We do not expect that courts will
forget that grand juries must operate within the limits of the First Amendment ." Branzburg v. Hayes, 408 U.S.
665 , 710 [ 1 Med.L.Rptr. 2617 ] (1972). In Branzburg, the Supreme Court ruled that there was no "reporter's
privilege" and that reporters were obliged to respond to grand jury subpoenas and to answer questions
relevant to an investigation into the commission of crime just as any citizen would. The Court found **[*3]** that
the First Amendment did not apply to prevent the testimony; "neither the First Amendment nor any other
constitutional provision protects the average citizen from disclosing to a grand jury information that he has
received in confidence." Id. at 682 . The Court stated that, "[i]f the test is that the government 'convincingly
show a substantial relation between the information sought and a subject of overriding and compelling state
interest,' " then that test was met in that case. Id. at 700-01 (citation omitted).

That test has been adopted by the courts of appeal facing the question of a grand jury subpoena implicating
the First Amendment . First, the government must demonstrate a compelling interest in the information sought
or a compelling need for the information sought. In re Grand Jury Subponea Duces Tecum, 78 F.3d 1307 ,
1312 (8th Cir.) (holding that "a grand jury subpoena will be enforced despite a First Amendment challenge if
the government can demonstrate a compelling interest in ... the information sought"), cert. denied 117 S.Ct.
432 (1996); In re Grand Jury Proceedings, 776 F.2d 1099 , 1102-03 (2d Cir. 1985) (holding that state interests
must be "compelling" and able to survive "exacting scrutiny" as to whether they are "sufficiently important to
outweigh the possibility of infringement" of the First Amendment by a grand jury subpoena); In re Grand
Subpoena, 701 F.2d 115 , 119 (10th Cur, 1983) (holding that, if the district court determines that enforcement
of a subpoena would chill associational rights, the government "must show a compelling need to obtain
documents identifying petitioners' members"); Bursey v. United States, 466 F.2d 1059 , 1083 (9th Cir. 1972) (
holding in the grand jury subpoena context that "[w]hen governmental activity collides with First Amendment
rights, the Government has the burden of establishing that its interest are legitimate and compelling and that
the incidental infringement upon First Amendment rights is no greater than is essential to vindicate its
subordinating interests"), overruled in part on other grounds, In re Grand Jury Proceedings, 863 F.2d 667 , 670
(9th Cir. 1988).

Second, the government must also show a sufficient connection between the information sought and the grand
jury investigation where there is a First Amendment challenge to a grand jury subpoena. In re Grand Jury
Subpoena Duces Tecum, 78 F.3d at 1312 (holding that "a grand jury subpoena will be enforced despite a First
Amendment challenge if the government can demonstrate ... a sufficient nexus between the information sought



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

// PAGE 3

⊞ In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc., No. 98-135 (NHJ) and 98-138 (NHJ), 1998 BL 139, 26
   Med. L. Rptr. 1599 (D.D.C. Apr. 06, 1998), Court Opinion

and the subject matter of its investigation"); *In re Grand Jury Proceedings*, 776 F.2d at 1103 (holding that there
must be a "substantial relation" between the governmental interest and the information required to be
disclosed.)

The Court finds, then, that it must determine whether the Office of Independent Counsel has a compelling need
for the materials it seeks and whether there is a sufficient connection between that information and the grand
jury's investigation. Because the OIC did not have an opportunity at the public hearing on this matter to make
such a submission, the Court will order that it do so at this time.

Accordingly it is this 6th day of April 1998,

ORDERED that the Office of Independent Counsel submit to the Court *ex parte* a filing describing **[*4]** its need
for the materials sought by the subpoenas to Kramerbooks and Barnes & Noble and the connection between
the information sought and the grand jury investigation, no later than Thursday, April 9, 1998, at 5:00 p.m.


## ORDER

Before the Court are two motions of *amici curiae*. The Court has previously granted the motion of American
Booksellers Foundation for Free Expression *et al* ("American Booksellers move to file their amicus brief on the
public record. Also pending is the motion of the American Civil Liberties Union and the American Civil Liberties
Union of the National Capital Area for leave to file a memorandum of law as *amici curiae* in support of
Kramerbooks' motion to quash a grand jury subpoena.

Upon consideration of these motions, it is this 6th day of April 1998.

ORDERED that the motion of the American Booksellers Foundation for Free Expression *et al* for leave to file
their *amici curiae* brief on the public record be, and hereby is, granted; it is further

ORDERED that the motion of the American Civil Liberties Union and the American Civil Liberties Union of the
National Capital Area for leave to file a memorandum of law as *amici curiae* in support of Kramerbooks' motion
to quash a grand jury subpoena, be, and hereby is, granted; it is further

ORDERED that the motions of *amici curiae* American Booksellers Foundation for Free Expression *et al*, and
the American Civil Liberties Union and the American Civil Liberties Union of the National Capital Area in
support of the motion of Kramerbooks to quash a grand jury subpoena be, and hereby are, *unsealed*.

---

fn 1

The Court finds that Kramerbooks and Barnes & Noble have standing to challenge the subpoena. *See*
Virginia v. American Booksellers Associations, 484 U.S. 383 , 392-93 [ 14 Med.L.Rptr. 2145 ] (1988).



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 4

➕ In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc., No. 98-135 (NHJ) and 98-138 (NHJ), 1998 BL 139, 26 Med. L. Rptr. 1599 (D.D.C. Apr. 06, 1998), Court Opinion

## Case Analysis ( 2 cases )

| Case Analysis Summary | |
|---|---|
| ➕ Positive | 2 |
| ◼ Distinguished | 0 |
| ⚠ Caution | 0 |
| ⬛ Superseded | 0 |
| ➖ Negative | 0 |
| Total | 2 |

1.   ➕ ▪▫▫▫▫   Cited in   ◼ Amazon.com, LLC v. Lay, 758 F. Supp. 2d 1154, 2010 ILRC 2863, 30 ILRD 700 (W.D. Wash. 2010)

2.   ➕ ▪▪▪▪▪   Discussed in   ➕ Tattered Cover, Inc. v. City of Thornton, 44 P.3d 1044, 30 Med. L. Rptr. 1656 (Colo. 2002)

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

⊞ In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc., No. 98-135 (NHJ) and 98-138 (NHJ), 1998 BL 139, 26 Med. L. Rptr. 1599 (D.D.C. Apr. 06, 1998), Court Opinion

## Direct History



| Direct History Summary | |
|---|---|
| ⚠ Caution | 0 |
| ⊟ Negative | 0 |
| Total | 0 |

1. ⊞ In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc., No. 98-135 (NHJ) and 98-138 (NHJ), 1998 BL 139, 26 Med. L. Rptr. 1599 (D.D.C. Apr. 06, 1998)

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service